UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JACKIE LYNN WILSON,        )<br>         Plaintiff,        )<br>                                )<br>   vs.                         )<br>                                )<br>MICHAEL J. ASTRUE, Commissioner of  )<br>the Social Security Administration,    )<br>         Defendant.        ) | | 1:09-cv-0661-LJM-TAB |

## **ENTRY ON JUDICIAL REVIEW**

The plaintiff, Jackie Lynn Wilson ("Wilson"), seeks judicial review of the final decision of the defendant, Commissioner of the Social Security Administration Michael J. Astrue ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). Acting for the Commissioner, Administrative Law Judge Ronald T. Jordan ("ALJ") determined that Wilson had severe impairments but retained the residual functional capacity ("RFC") to perform a significant number of jobs and, therefore, was not disabled for purposes of the Act. Wilson contends that the Commissioner's decision is not supported by substantial evidence. Wilson further contends that the Commissioner erred as a matter of law in denying her claim. For reasons that the Court articulates below, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

### A. RELEVANT MEDICAL HISTORY

Wilson was born on November 1, 1960.  R. at 66.  She is a high school graduate.  R. at 101.  Wilson has experience working in the automotive industry where she had a series of jobs related to the assembly and distribution of auto parts.  R. at 449.  One position required that Wilson load semi-trailers by hand, and another involved the use of an industrial sewing machine.  *Id.*  Wilson's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2009.  R. at 10.  Thus, Wilson must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.  Wilson alleges that she is disabled due to short-term memory loss, which she attributes to a pair of ruptured cerebral aneurysms that were diagnosed and treated in 2004.  R. at 53.  Wilson further alleges that she suffers from depression.  *Id.*

On September 24, 2004, Wilson went to see her primary care physician, Dr. Troy T. Quiz ("Dr. Quiz").  R. at 339.  She reported having experienced the sudden onset of a severe headache three days earlier.  *Id.*  The headache was constant and accompanied by nausea, vomiting and a stiff neck.  *Id.*  Dr. Quiz recommended that Wilson go to the emergency room at Methodist Hospital for further evaluation.  *Id.*

A computed tomography (CT) scan of Wilson's head suggested the presence of a subarachnoid hemorrhage.  R. at 205.  A lumbar puncture (LP) was also performed, which was positive for blood.  R. at 339.  On the basis of these test results, Wilson was admitted to the hospital for further neurosurgical evaluation and treatment by the Indianapolis Neurosurgical Group.  *Id.*  Upon admission, a cerebral angiogram was ordered.  *Id.*  The

test confirmed an anterior communicating artery aneurysm. *Id.* Wilson also had a small left middle cerebral artery aneurysm. *Id.* She was subsequently admitted to the neuro critical care unit for close observation and medical management. *Id.*

On September 25, 2004, Dr. Troy D. Payner ("Dr. Payner") performed a craniotomy with clip ligation, which Wilson tolerated without problems. R. at 168-76. After both aneurysms were repaired, Wilson was readmitted to the neuro critical care unit postoperatively for close observation. R. at 339. She was discharged from the hospital on October 4, 2004. *Id.*

On October 26, 2004, Dr. Payner performed a follow-up evaluation of Wilson in his office. R. at 340. In a letter to Dr. Quiz, Dr. Payner reported that Wilson "did very well postoperatively." *Id.* Dr. Payner wrote, "[Wilson] indicates she continues to do well. She feels that she is basically back to her baseline function." *Id.* Dr. Payner also stated that, "[Wilson's] short-term memory is improving, but not quite back to normal." *Id.* On May 3, 2005, Dr. Payner performed another follow-up evaluation in his office. R. at 336. On that occasion, Wilson indicated that she was, in general, doing well. *Id.* However, she also reported experiencing significant problems with her short-term memory. *Id.* Dr. Payner recommended that Wilson undergo neuropsychologic testing to confirm the exact extent of her cognitive deficits. *Id.*

On June 1, 2005, Dr. Stephanie R. Peabody ("Dr. Peabody") of Geriatric Behavioral Consultants performed an assessment of Wilson's neuropsychological and psychological functioning. R. at 101-03. The results of the testing were reportedly consistent with mild to moderate neuropsychological impairment. R. at 102. Dr. Peabody's findings included the following passage:

3

> I strongly suspect that her impairment is a function of several factors. There is evidence suggestive of residual dysfunction related to her ruptured aneurysm. However, the degree of disturbances demonstrated on the evaluation were considerably beyond that expected given her relatively uncomplicated post-neurosurgery course, including improved functioning several months after her surgery. Moreover, there were a number of inconsistencies in her memory findings that would suggest that her effort also played a role in the evaluation findings.

R. at 102. Dr. Peabody went on to cite as an example "the fact that repeated exposure had little effect on [Wilson's] overall learning curve." *Id.* Dr. Peabody characterized this as "highly unusual." *Id.*

On July 19, 2005, Dr. Albert H. Fink ("Dr. Fink") of the Indiana Disability Determination Bureau ("DDB") performed another psychological evaluation of Wilson. R. at 129-32. Dr. Fink's findings included the following passage.

> Formal memory testing indicated that the claimant is experiencing difficulty in dealing with a number of day-to-day memory tasks for which she is compensating through the use of simple memory aids. [This] approach appears to be having a positive effect. One can only speculate as to the extent . . . the claimant's memory dysfunction will improve or not.

R. at 131. Dr. Fink went on to say, "The claimant reports no fundamental difficulties with [activities of daily living] and would appear capable of functioning in typical work environments provided that memory tasks are limited in their complexity." *Id.*

Wilson was also required to undergo an internal medicine examination scheduled by the DDB. R. at 106-10. This evaluation was performed by Dr. Shuyan Wang ("Dr. Wang") of PSB Medical on July 26, 2005. *Id.* Dr. Wang concluded that there was "no clinical evidence to suggest physical restrictions needed for work placement." R. at 110. A review of the medical evidence of record by a state agency psychologist later that month concluded that Wilson did not have a medically determinable mental impairment. R. at 115.

Wilson's primary care physician continued to treat her following the surgical repair of the two ruptured aneurysms. R. at 346-65. Dr. Quiz treated Wilson early in 2006 for sinus problems and headache. R. 423-24. He also managed Wilson's high blood pressure. R. at 374. In August of 2006, Wilson was referred to the Hamilton Center for treatment of depression. R. at 396. She was diagnosed with major depressive disorder without psychotic features and generalized anxiety disorder. R. at 405. The medical record indicates that Wilson received treatment for depression in 2006, 2007 and 2008. R. at 381-407.

In 2007, Wilson's attorney referred her to Flagstone Psychology for a mental status examination. R. at 369. On December 20, 2007, April J. Faidley, Ph.D., HSPP ("Dr. Faidley") conducted an evaluation that included an assessment of Wilson's adaptive functioning. R. at 369-74. During the evaluation Wilson stated that she did all the household cleaning and laundry, and some cooking with supervision from her ex-husband. R. at 370. In her report Dr. Faidley wrote, "I surmise that Ms. Wilson's surgery has had a detrimental effect on her level of intellectual functioning." R. at 374.

### B. PROCEDURAL HISTORY AND TESTIMONY AT THE HEARING

On May 18, 2005, Wilson filed applications for DIB and SSI. R. at 37-39. Her applications were denied on August 19, 2005. R. at 59-62. Wilson's request for reconsideration was denied on October 11, 2005. R. at 54. On November 11, 2005, Wilson requested a hearing by an ALJ. R. at 53. The hearing was conducted at the Indianapolis Office of Disability Adjudication and Review on June 2, 2008. R. at 433.

During the hearing, Wilson testified that she had difficulty remembering even basic things, like getting dressed. R. at 444-54. She said that she used memory aids, like notes, to compensate for her short-term memory loss. *Id.* Wilson further testified that her ex-husband, with whom she lived, needed to constantly remind her of appointments and household tasks. *Id.* Wilson's ex-husband testified that he either cooked meals or supervised Wilson because he feared that she would forget to turn off the stove. R. 455-63. He further testified that Wilson was not home alone for more than three hours at a time, and that she seldom went out alone. *Id.*

Dr. Karl Manders ("Dr. Manders") testified at the hearing as a medical expert. R. at 438. Dr. Manders opined that Wilson's impairments were severe and equaled the criteria of Listing 12.02 Organic Mental Disorders ("Listing 12.02") in 20 C.F.R. Part 404, Subpart P, Appendix 1.[1] R. at 443-44. Dr. Manders testified that there was documented, objective medical evidence that satisfied the "A" criteria of Listing 12.02. *Id.* However, he further testified that he could not pinpoint any documentation of the requisite "B" criteria.[2] *Id.* Upon cross examination, Dr. Manders again testified that Wilson met the "A" criteria, but he was "not sure" whether Wilson's medical condition resulted in marked limitations in at least two

---

[1] The Social Security Administration's "Blue Book" Listing of Impairments describes, for each major body system, impairments considered severe enough to prevent an individual from doing any gainful activity. The specified impairments are considered presumptively disabling. A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing. 20 C.F.R. §§ 404.1525, 1526.

[2] In addition to the "A" criteria, the medical condition must result in at least two of the following "B" criteria: (1) Marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. Listing of Impairments, Listing 12.02 Organic Mental Disorders.

"B" areas of functioning. R. at 469-70. He stressed his earlier testimony that such deficits or limitations were "undocumented." *Id.*

Robert Barber ("Barber") testified at the hearing as a vocational expert. R. at 471. The ALJ asked Barber whether he could identify any jobs that could be performed by an individual Wilson's age, with her education and work experience, who has the capacity to perform light exertional work in a low stress atmosphere, and who is limited to routine, repetitive tasks with no unusually high time or production quotas. R. at 472-73. Barber testified that given all of these factors, the individual would be able to perform the requirements of representative occupations such as Housekeeper (2,230 jobs in Indiana), Information Clerk (1,430 jobs in Indiana), and/or Cashier (22,350 jobs in Indiana). R. at 473. He further testified that there would be no competitive employment available if the same individual required supervision approximately every fifteen minutes in order to remain on task. *Id.*

On August 6, 2008, the ALJ concluded that Wilson was not disabled for purposes of the Act and issued his decision denying benefits. R. at 7-24. On October 2, 2008, Wilson filed a request for a review of the decision. R. at 6C-6D. The Appeals Council denied her request for review on April 20, 2009. R. at 4-6. This left the ALJ's decision as the final decision of the Commissioner. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Wilson filed this civil action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is

insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III.  DISCUSSION

#### A. THE ALJ'S FINDINGS

Applying the five-step process, the ALJ first found that Wilson had not engaged in substantial gainful activity since her alleged disability onset date. R. at 12. At step two, the ALJ found that Wilson had severe impairments—specifically, residuals of brain aneurysm and depression. *Id.* At step three, the ALJ found that Wilson failed to demonstrate she had an impairment, or combination of impairments, that met or medically equaled one of impairments identified in the Listing of Impairments. *Id.* The ALJ also noted that, "The

medical record is not entirely consistent with the claimant's allegations of disabling symptoms." R. at 19.

In between steps three and four, the ALJ concluded that: (1) Wilson retained the RFC to perform the full range of light exertional work; (2) Wilson is capable of work involving routine, repetitive tasks; and (3) Wilson should not be required to meet any unusually high time or production quotas. R. at 16. At step four of the sequential analysis, the ALJ found that Wilson was unable to perform any of her past relevant work. R. at 22. Considering Wilson's age, education, work experience and RFC—and relying on the testimony of Barber—at step five the ALJ found that Wilson could perform a significant number of jobs in the national economy and that, therefore, she was not disabled for purposes of the Act. *Id.*

## B. WILSON'S ARGUMENTS ON APPEAL

Wilson makes three arguments on appeal. First, Wilson asserts that the ALJ erred as a matter of law in rejecting Dr. Manders' testimony that Wilson's impairment equaled Listing 12.02. Second, Wilson alleges that the ALJ's RFC finding is not supported by substantial evidence. Third, Wilson contends that the Commissioner failed to meet his burden of proof at step five. The Court addresses each argument in turn.

### 1. Dr. Manders' Opinion

Wilson argues that the ALJ erred as a matter of law in rejecting Dr. Manders' testimony that Wilson's impairment equaled Listing 12.02. Wilson asserts that Dr. Manders'

expert medical opinion was entitled to great weight and that it was consistent with the evidence of record. Wilson further contends that the ALJ improperly required corroboration of her testimony and that of her ex-husband. Finally, Wilson alleges that the ALJ failed to build a logical bridge between the evidence and his conclusion that Wilson did not have an impairment equal to Listing 12.02.

The ALJ found, and Dr. Manders testified, that there was documented, objective medical evidence that satisfied the "A" criteria of Listing 12.02. R. at 13, 443-44. However, the ALJ concluded that the record did not document the presence of signs and symptoms sufficient to meet the requisite "B" criteria. R. at 13-15. The ALJ's finding is not at odds with the opinion rendered by Dr. Manders at the hearing. As the ALJ properly noted, Dr. Manders testified that he could not point to any documented evidence suggesting a marked restriction of activities of daily living or difficulties in maintaining social functioning. R. at 13, 444. Rather, the only evidence of these alleged deficits was the testimony of Wilson and her ex-husband.

A determination of whether an impairment meets or medically equals the requirements of a listed impairment must be based on the medical evidence of record. 20 C.F.R. § 404.1520a(d)(2). Therefore, it was reasonable for the ALJ to give the equivocal opinion of Dr. Manders little weight where it was based on the uncorroborated testimony of Wilson and her ex-husband. The ALJ properly gave more weight to Dr. Manders' testimony concerning what the documented medical evidence showed with respect to the "B" criteria. The ALJ was right to consider Dr. Manders' opinions in coordination with all of the other evidence of record when making his determination as to whether Wilson had a listed impairment.

Wilson's allegation that the ALJ failed to build a logical bridge between the evidence and his conclusion is unsupported. The ALJ's decision included a thorough analysis of the various requirements of Listing 12.02 and reasons for giving little weight to Dr. Manders' opinion that subjective statements suggested Wilson might have met the requisite "B" criteria. The ALJ also pointed to numerous facts in the record that strongly suggest that Wilson has only moderate difficulties in activities of daily living and mild difficulties in social functioning. For example, Wilson reported that she could clean, dry, fold and put away laundry, drive a car, go grocery shopping, clean the house and cook meals. Wilson also reported that she left the house once a week, that she had a good relationship with her daughter, and that she intended to look into volunteering at the Humane Society.

In short, the ALJ relied on the reports of the various medical and mental health professionals of record to conclude that Wilson did not have marked limitations in at least two "B" areas of functioning. He specifically discussed the clinical findings and observations of record as they related to each of the relevant "B" criteria. The Court concludes, therefore, that the ALJ's listing decision is legally sound and supported by substantial evidence.

### 2. The ALJ's Assessment of Wilson's RFC

Wilson alleges that the ALJ's RFC finding is not supported by substantial evidence because it fails to incorporate the limiting effects of her alleged mental health symptoms. Specifically, Wilson asserts that the RFC finding does not address her reported need for memory assistance tools and supervision.

In support of his finding, the ALJ cited the testimony of Dr. Manders. Specifically, the ALJ noted that Dr. Manders testified Wilson was basically neurologically intact despite her memory deficit. In addition, the ALJ recounted Dr. Manders' testimony that Wilson could perform repetitive tasks. Moreover, the ALJ also considered all of Wilson's self-reported symptoms, and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence. After considering the evidence of record, the ALJ found that Wilson's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the ALJ concluded that Wilson's statements (and those of her ex-husband) concerning the intensity, persistence and limiting effects of these symptoms were not credible "to the extent that they are inconsistent with the [RFC] assessment . . . ." R. at 18.

Whenever statements about the intensity, persistence or functionally limiting effects of symptoms are not substantiated by objective medical evidence, the ALJ must consider the entire case record to determine the credibility of the witnesses' statements. In this case, the ALJ identified a long list of inconsistencies and contradictions in the testimony proffered by Wilson and her ex-husband. For example, the ALJ noted that during a psychiatric evaluation, Wilson reported she never went out without someone accompanying her for fear of getting lost. Wilson further alleged (during a subsequent evaluation) that she did not participate in purchasing decisions. However, at the hearing, Wilson's ex-husband testified that his ex-wife occasionally drove herself to Wal-Mart.

Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, the Court affords their credibility determinations special deference. *See Nelson*, 131 F.3d at 1237. The Court will reverse an ALJ's credibility

determination only if the claimant can show it was "patently wrong." *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002). In this case, the ALJ's credibility determination is buttressed by the contradictions and inconsistencies in the record. Because this evidence may be characterized as that which a reasonable mind might accept as adequate to support the ALJ's conclusion, the Court finds that the ALJ's RFC finding is supported by substantial evidence.

### 3. The ALJ's Step Five Decision

Lastly, Wilson argues that the Commissioner failed to meet his burden of proof at step five. During the hearing on June 2, 2008, the ALJ asked Barber whether jobs existed in the national economy for an individual Wilson's age with her education, work experience and RFC. Barber testified that such an individual could perform more than 26,000 jobs in the local region. R. at 473. The ALJ then said, "Now add onto Hypothetical One that this individual would require supervision approximately every [fifteen] minutes to assure that the person is on task with work-related matters. With this additional limitation, could this person perform within the competitive work economy?" *Id.* Barber testified that there would be no competitive employment available under the second hypothetical scenario. Wilson alleges that the ALJ erred because he did not consider Barber's testimony that there would be no competitive employment for an individual who required supervision every 15 minutes.

The hypothetical question posed by the ALJ to the vocational expert must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record. *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993). However, an ALJ need only consider the testimony of a vocation expert given in response to a hypothetical

14

question containing the functional limitations he finds to be credible and well-supported by the record.  *See Herron*, 19 F.3d at 337.

The ALJ was not required to note or consider Barber's testimony that there would be no competitive employment available under the second hypothetical scenario because the ALJ did not find that Wilson required supervision every fifteen minutes.  The ALJ's RFC finding and initial hypothetical question to Barber were complete, accurate and supported by substantial evidence.  Thus, Barber's testimony provided substantial support for the ALJ's finding that Wilson could perform a significant number of jobs in the national economy and that, therefore, she was not disabled.

## IV.  **CONCLUSION**

For the foregoing reasons, the final decision of the Commissioner of Social Security in this case is **AFFIRMED**.  Final judgment shall be entered accordingly.

IT IS SO ORDERED this 26th day of May, 2010.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

Annette Lee Rutkowski
annette@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

15